Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence, or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence AFFIRMS in part and MODIFIES in part the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as facts and concludes as matters of law the following which were agreed upon by the parties in the Form 21 Agreement for Compensation approved by the Industrial Commission on 4 August 1994 as
STIPULATIONS
1. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act and General Accident Insurance Company is the carrier on the risk.
2. On 30 April 1993, plaintiff sustained an injury by accident to his back arising out of and in the course of his employment with defendant-employer.
3. Plaintiff's average weekly wage, subject to verification at the time of injury, was $480.00.
4. The parties also submitted into evidence by stipulation a group of documents marked as Stipulated Exhibit 1.
* * * * * * * * * * *
The Full Commission adopts in part and modifies in part the findings of fact by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 33 years old, with a date of birth of 24 October 1963. For his education plaintiff had completed high school and had vocational training in plumbing and electronics. Plaintiff holds a Master's License in plumbing and has supervisory experience in the plumbing trade. For his medical history, plaintiff had been to the emergency room in 1992 reporting low back pain.
2. In April 1993 plaintiff was working for defendant as a plumber. On 30 April 1993 (Friday) plaintiff sustained an admittedly compensable injury by accident when he was hit in the back by scaffolding which was being moved on a construction site. Prior to this accident, plaintiff had sent a resume to Thompson Plumbing (hereinafter "Thompson") applying for a supervisory job with that company.
3. The accident occurred in the morning before lunch. Plaintiff was able to finish the workday and to rest over the weekend. He returned to work on Monday morning, but was only able to complete one-half of the day because of low back pain. On 5 May 1993 (Wednesday) plaintiff went to Dr. P. K. George, his family doctor, where he reported the accident with the scaffolding. Dr. George ordered x-rays; and at the time of the x-rays, there were some degenerative changes at spinal levels L5-S1, but there were no disc fractures nor disc dislocations. Dr. George referred plaintiff to Dr. Tejpal Dhillon, an orthopedic surgeon.
4. The first examination by Dr. Dhillon was on 11 May 1993 (about two weeks after the accident). At this examination there were no bruises on plaintiff's back. There were moderate spasms of the lumbar sacral muscles. The results of straight leg raising tests were positive for both the right and the left leg. At this time plaintiff was diagnosed as having an acute lumbosacral strain. Dr. Dhillon prescribed medication and physical therapy, and Dr. Dhillon excused plaintiff from work for two weeks.
5. Dr. Dhillon excused plaintiff from work for an additional period of two weeks beginning 24 May 1993 and thereafter placed plaintiff on light duty work beginning 7 July 1993. Defendant paid temporary total disability compensation to plaintiff during the above times he was out of work.
6. While still working for defendant, Dr. Dhillon referred plaintiff to Park Medical Center for a further evaluation. Dr. Kristi Peterson performed the evaluation on 27 May 1993 (about four weeks after the accident). At this time plaintiff reported that his condition had improved under Dr. Dhillon's care, but he experienced a great deal of pain when in a seated position for prolonged periods. Plaintiff walked with an antalgic gait, and used his arms to help lift himself out of a chair. The results of straight leg raising tests were negative. Plaintiff continued to suffer from a lumbosacral strain. Dr. Peterson recommended work restrictions including not lifting more than ten pounds and to alternate between sitting and standing.
7. On 19 July 1993, three days before plaintiff left defendant's employment, plaintiff underwent an Isostation B-200 Study on referral from Dr. Dhillon which indicated that plaintiff had mild back dysfunction, but no deficit in range of motion or power.
8. On 22 July 1993, plaintiff left defendant's employment to accept a better job at Thompson for which he had applied before the accident. The job with Thompson was to supervise several construction sites. The job did not involve heavy physical labor, but it did require driving for long distances. In the approximate two months plaintiff was with Thompson, he drove the company truck about 6,000 miles. Plaintiff was allowed to drive the truck home after work. About 75 percent of plaintiff's time with Thompson was spent out of the office doing field work. Plaintiff earned greater wages at Thompson than he earned with defendant-employer.
9. Rhonda Johnson worked in the Personnel Office at Thompson. Ms. Johnson saw plaintiff every day, although most of his time was spent away from the office. Plaintiff did not complain to Ms. Johnson of any physical problems doing his job, and Ms. Johnson did not notice any physical limitations from plaintiff.
10. One morning in September 1993 plaintiff was scheduled to be in the office at Thompson to review shop drawings. Plaintiff missed the meeting and was terminated. Plaintiff testified that he missed the meeting because his car broke down and that he quit the job at Thompson because he could not physically do the work due to low back pain.
11. While with Thompson, plaintiff had one examination with Dr. Dhillon on 3 August 1993. Plaintiff reported mild to moderate pain. At this examination there was mild to moderate guarding and muscle spasms on extremes of motion. Dr. Dhillon prescribed continued medication, but recommended a discontinuance of physical therapy.
12. Plaintiff returned to Dr. Dhillon on 23 September 1993. It is unclear if this was before or after plaintiff stopped working at Thompson, and his work status was not discussed in Dr. Dhillon's medical note. Plaintiff reported to Dr. Dhillon that his condition was unchanged, but that the pain was made worse when raking his yard or bending over.
13. Six weeks after the September, 1993 examination, plaintiff returned to Dr. Dhillon on 9 November 1993. Plaintiff reported continued mild to moderate discomfort, especially after a day of heavy work. Plaintiff had been out of work for more than a month at this time. On examination there were muscle spasms, moderate limitation on flexion and extension, and pain at extremes of motion. Dr. Dhillon diagnosed a mild lumbosacral sprain. It was Dr. Dhillon's opinion that plaintiff could return to work at light duty and should continue with medication. It was also Dr. Dhillon's opinion that plaintiff was at maximum medical improvement and retained a five percent permanent partial impairment to the use of his back as a result of the accident of 30 April 1993.
14. Although plaintiff claimed to be unable to perform the job requirements at Thompson, he was able to perform heavy yard work and mechanical work on his car. On 14 November 1993 (about one week after Dr. Dhillon's 9 November 1993 examination) plaintiff was helping to change a starter in his car when he experienced increased low back pain. Plaintiff tried to drive himself to the emergency room, but was not able to drive. At 4:00 o'clock in the morning, he called the rescue squad to transport him to the hospital. Plaintiff told the ambulance attendant that he had experienced back problems for six months (which would be consistent with the 30 April 1993 accident), but that the onset of his pain had occurred while changing the starter in his car. Plaintiff was taken to Eastern Wake Medical Hospital, but the emergency room medical report for that morning was not introduced at the hearing.
15. Three weeks after the incident of installing the car starter (6 December 1993), plaintiff returned to Dr. Dhillon. Plaintiff did not tell Dr. Dhillon of the recent treatment at the emergency room for his back. At this examination plaintiff reported increased low back pain, symptoms which were constant, and a burning sensation in his back. Dr. Dhillon diagnosed a "recurrent" lumbosacral strain.
16. Plaintiff's last examination by Dr. Dhillon was on 4 January 1994. At this time Dr. Dhillon recommended continued medication and physical therapy. In his note he questioned that plaintiff could return to work "next time."
17. Defendant referred plaintiff to Dr. Michael Gwinn and Triangle Spine and Back Care Center for an evaluation and physical therapy. Dr. Gwinn ordered an MRI which showed a mild central disc bulge at spinal level L4-S1, with no disc herniation. The finding that there was no disc herniation is based on the opinions of Dr. Gwinn, Dr. Rosen, and Dr. Dhillon who reviewed the MRI and concurred in its interpretation. It was the opinion of Dr. Craig Derian that the MRI demonstrated a herniated disc which would be "grossly apparent" even to one without medical training. The Full Commission accords greater weight to the opinions of Dr. Gwinn, Dr. Rosen and Dr. Dhillon, than to those of Dr. Derian on this issue.
18. Dr. Gwinn's first physical examination of plaintiff was on 20 December 1993. The results of the physical examination were generally within normal limits. Reflexes and lower extremity strength were equal. Lower extremity sensations were intact. Toes were down going, and there was no ankle clonus. The results of straight leg raising tests were negative. There was a full, pain-free range of motion of the hips. There was no focal tenderness on palpitation or percussion of the thoracic lumbar spine, although there was tenderness on the left at the mid and lower thoracic paraspinal. Sensation was normal in the thoracic dermatomes.
19. During physical therapy, the therapist noted inconsistencies in plaintiff's performance. Plaintiff's facial expressions and responses seemed over-exaggerated. Plaintiff showed physical signs of symptom magnification. For example, plaintiff showed labored breathing and facial grimaces while performing on some machines; but immediately afterward, he had a normal heart rate.
20. On 24 February 1994 (about ten months after his accident), Dr. Gwinn expressed his final opinion concerning plaintiff's condition. In his opinion, plaintiff had reached maximum medical improvement, plaintiff was capable of returning to work at light to medium jobs with restrictions of lifting 35 pounds on an occasional basis and that plaintiff retained a three percent permanent partial impairment to the use of his back.
21. In February 1994 plaintiff began to report severe headaches. Plaintiff made several trips to the emergency room for treatment for his headaches. Plaintiff's doctors could not relate the cause of plaintiff's headaches to his injury by accident on 30 April 1993. Therefore, there is insufficient evidence of record from which the undersigned can determine from its greater weight that the headaches plaintiff claimed to have experienced were the natural and probable consequence of the injury by accident of 30 April 1993. At the time of the hearing, plaintiff testified that his headaches had "quit."
22. Plaintiff obtained an evaluation from Dr. Craig Derian on 19 May 1994, more than a year after the accident. During Dr. Derian's physical examination plaintiff reported no acute distress, but reported discomfort when rising from a seated to a standing position. Plaintiff changed positions frequently during the examination. Plaintiff reported that his primary pain was in the low back and right buttocks. Dr. Derian noted spasm on the right and the left at the lumbosacral joint. On palpitation plaintiff reported discomfort at the right buttocks and right thigh, with none on the left. The results of straight leg raising tests were negative on the left, but were positive on the right at 20 degrees without reproducing radiating pain. Reflexes were symmetrical. Side bending produced discomfort on the right, and light sensation was intact. There was a full, pain-free range of motion for the hips and knees. As noted above, it was Dr. Derian's opinion that plaintiff had a herniated spinal disc; and it was also Dr. Derian's opinion that plaintiff should consider a lumbar decompression stabilization and a fusion procedure at spinal level L5-S1.
23. After the examination by Dr. Derian, plaintiff went to the emergency room on several occasions seeking treatment for low back pain.
24. Based upon the greater weight of the evidence, plaintiff's work-related injury caused physical restrictions, but did not prevent him from working and earning the same or greater wages after 23 July 1993 when he obtained employment at Thompson.
25. From 23 July 1993 and continuing, plaintiff has been capable of gainful employment; and there are jobs available within the competitive job market which plaintiff could reasonably be expected to obtain. This finding is based on a consideration of plaintiff's age (33), his education (high school and vocational training), and his transferable skills (Master's Plumbing License with supervisory experience); and more specifically, it is based on the fact that plaintiff did obtain suitable employment earning greater wages after voluntarily leaving defendant's employment. Plaintiff left the second job for reasons other than any physical limitations or disability.
26. On 9 November 1993 plaintiff reached maximum medical improvement and retained a five percent permanent partial impairment to the use of his back as a result of the accident of 30 April 1993. This finding is based on the opinions of Dr. Dhillon who was plaintiff's primary treating physician at the time.
* * * * * * * * * * *
The foregoing stipulations and findings of fact engender the following
CONCLUSIONS OF LAW
1. Pursuant to a Form 21 agreement approved by the Industrial Commission, plaintiff was paid temporary total or temporary partial disability compensation benefits from 5 May 1993 through 27 July 1993. The Form 21 agreement covered a period of 12 weeks.
2. From 23 July 1993 and continuing plaintiff is not entitled to temporary total disability compensation as a result of the injury by accident of 30 April 1993 as he voluntarily left his employment with defendant-employer and began work with a different employer earning greater wages on said date.
3. As a result of the injury by accident of 30 April 1993, plaintiff is entitled to permanent partial disability compensation in the amount of $320.00 per week for 15 weeks for the five percent permanent partial impairment to his back. N.C.G.S. § 97-31
(23).
4. As a result of his 30 April 1993 injury by accident, plaintiff is entitled to payment by defendants for such medical treatment and evaluations as may be reasonably required to effect a cure, provide relief and/or would tend to lessen his disability. N.C. Gen. Stat. § 97-25.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Plaintiff's claim for additional temporary total disability compensation after 23 July 1993 pursuant to the North Carolina Workers' Compensation Act must be, and the same is hereby, DENIED.
2. Defendants shall pay plaintiff permanent partial disability compensation in the amount of $320.00 per week for 15 weeks due to the five percent permanent partial impairment to the use of his back. As said amount has accrued, payment shall be made in a lump sum, and payment shall be subject to an attorney's fee as provided below.
3. Defendants shall pay all medical expenses incurred, or to be incurred by plaintiff as a result of the injury by accident of 30 April 1993 for so long as such evaluations and treatments are reasonably required to effect a cure, provide relief, or would tend to lessen his disability when bills for same have been submitted and approved through procedures adopted by the Commission.
4. Plaintiff's motion to approve the evaluation by Dr. Craig Derian is hereby, ALLOWED.
5. An attorney's fee in the amount of 25 percent of all compensation due plaintiff is hereby approved for plaintiff's counsel. Payment shall be made by deducting 25 percent from all compensation due plaintiff and forwarding same directly to plaintiff's counsel.
6. Defendants shall pay the costs due this Commission, including an expert witness fee in the amount of $500.00 to Dr. Gwinn, $500.00 to Dr. Dhillon and $500.00 to Dr. Derian.
 S/ _____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ __________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DISSENTING:
S/ __________________ J. RANDOLPH WARD COMMISSIONER
BSB:md